E-FILED
Tuesday, 16 June, 2026  01:57:53 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

COREY B.,

    *Plaintiff,*

v.

    Case No. 1:25-cv-01391-RLH

FRANK BISIGNANO, Commissioner of
Social Security,

    *Defendant.*

### ORDER & OPINION

Plaintiff Corey B. ("Corey") filed this suit to challenge an administrative law judge's finding that he was not disabled under the Social Security Act and thus ineligible for benefits. The parties have consented to final disposition by a U.S. Magistrate Judge. (Doc. 8.) Because the ALJ's decision was supported by substantial evidence, the Commissioner's decision will be affirmed.

### LEGAL STANDARD

**I.  The Social Security Act**

The Social Security Act—and the regulations adopted under it—explain in detail who is eligible to receive social security benefits. To qualify, a claimant must be sixty-five years of age, blind, or disabled. 20 C.F.R. § 416.202(a)(1)–(3). A claimant is disabled if she cannot "do any substantial gainful activity" because she suffers from "any medically determinable physical or mental impairment" that is either life-threatening or chronic. 42 U.S.C. § 423(d)(1)(A).

To implement that definition, the Social Security Administration has developed a five-step evaluation process. *See* 20 C.F.R. § 416.920(a)(1). The steps proceed sequentially:

**Step One.** Is the claimant currently engaged in substantial gainful activity?

**Step Two.** Does the claimant have a severe mental or physical impairment—i.e., an impairment that significantly limits their ability to do basic work activities—or a combination of them?

**Step Three.** Does the mental or physical impairment appear on an enumerated list (called "listings")? If not, is it nonetheless medically equal to one of those listings?

**RFC Assessment.** What is the claimant's residual functional capacity (RFC)—that is, the most they can still do despite their limitations?

**Step Four.** Based on the claimant's RFC, can they perform their past work?

**Step Five.** Based on the claimant's RFC, can they perform other work?

*See id.* § 416.920(a)(4)(i)–(v). The ALJ begins, of course, at step one. If it yields an affirmative answer (i.e., the claimant is working), the claimant is not disabled, and the inquiry ends. If step two yields a negative answer (i.e., the claimant does not have a severe impairment), the claimant is not disabled, and the inquiry ends. *See id.* §416.920(a)(4)(i)–(ii). Step three, however, is dispositive: If the claimant's impairment appears on a listing, the claimant is considered disabled and eligible for benefits. *See id.* § 416.920(a)(4)(iii). If the claimant's impairment does not appear on or medically equal a listing, the ALJ crafts an "RFC Assessment," which analyzes "the claimant's ability to do physical and mental work activities on a regular and continuing basis despite limitations from [their] impairment." *Moore v. Colvin,* 743 F.3d 1118, 1121

2

(7th Cir. 2014). If either steps four or five yield an affirmative answer (i.e., the claimant can perform their old job or adjust to a new one in light of the RFC), the claimant is not disabled. *See* 20 C.F.R. § 416.920(a)(4)(iv)–(v).

The claimant has the burdens of production and persuasion through step four. *See Wilder v. Kijakazi*, 22 F.4th 644, 651 (7th Cir. 2022). At step five, the burden shifts to the Commissioner to show that the claimant can engage in some type of substantial gainful employment. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

## II.    Standard of Review

A court's function on review is limited to determining whether the ALJ's findings are supported by substantial evidence and based upon proper legal criteria. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). Substantial evidence, in turn, is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (explaining that the threshold "is not high"); *Schneck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) ("Substantial evidence may be less than the weight of the evidence, and more than a scintilla." (citation modified)). Yet, while the ALJ's decision commands deference, courts may not simply "rubber stamp" it. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).

The Seventh Circuit has emphasized that ALJs are "subject to only the most minimal of articulation requirements" and "need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning." *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024). Instead, ALJs need only "provide an explanation for how the evidence leads to their conclusions that is 'sufficient to allow . . . a reviewing court, to assess the validity of the agency's ultimate findings and afford [the plaintiff] meaningful judicial review.'" *Id.* at 1054 (alteration in original) (quoting *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014)). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary"—not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). Therefore, courts reviewing for substantial evidence may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [their] judgment for the ALJ's determination so long as substantial evidence supports" the decision under review. *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). In short, the ALJ must build "an accurate and logical bridge" between the evidence in the record and his conclusions. *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013).

## BACKGROUND

### I.    Corey

Corey was born in 1974, (R. at 200[1]), has earned his high-school equivalency, (R. at 269), and previously worked as a fast food worker, a retail store laborer, and a dishwasher, (R. at 227). At the hearing before the ALJ, Corey stated that he suffers from social anxiety and experiences panic attacks. (R. at 41–42, 48.) He also indicated that he has been diagnosed with COPD—a condition that causes him to be tired and short of breath. (R. at 45.) When asked about treatment for his conditions, Corey responded that he takes medication that works well, but—notwithstanding the medication, he "still ha[s] problems." (R. at 46.)

### II.    Procedural History

Corey applied to the Social Security Administration in March 2022 for disability benefits, alleging that he has been disabled since January 1, 2020. (R. at 15.) His application was initially denied in February 2023 and denied upon reconsideration in October. (R. at 15.) He then requested a hearing before an ALJ, (R. at 15), which took place in April 2024, (R. at 15; 34). Present at the hearing were Corey, his attorney, and a vocational expert. (R. at 34.)

After the hearing, the ALJ issued a written opinion concluding that Corey was not disabled and therefore not entitled benefits. (*See* R. at 15–28.) In response, Corey sought review of the ALJ's decision with the Appeals Council, who denied his request.

---

[1] "R." refers to the Certified Administrative Record filed on November 17, 2025. (Doc.6.) The page numbers cited in this Order refer to the black page numbers at the bottom right of each page of the transcript rather than the green page numbers generated automatically by CM/ECF at the top right.

(R. at 1.) Corey then filed a complaint in this Court challenging the ALJ's decision. He filed his brief five months later, (Doc. 10), the Commissioner responded, (Doc. 16), and Corey replied, (Doc. 17).

### III. The ALJ's Decision

In his opinion, the ALJ used the five-step evaluation process outlined above to determine whether Corey was disabled. At step one, he determined that Corey has not engaged in substantial gainful activity since January 1, 2020—the date Corey alleges he became disabled. (R. at 18.) At step two, the ALJ found that Corey had three severe impairments: (1) Chronic Obstructive Pulmonary Disease (COPD); (2) affective disorder; and (3) anxiety disorder. (R. at 18.) At step three, the ALJ concluded that none of Corey's impairments met or medically equaled any of the listed impairments. (R. at 18–19.) Before proceeding to steps four and five, the ALJ crafted the following RFC assessment:

> [Corey] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following non-exertional limitations. He should climb no more than occasionally, and he should perform all other postural activities no more than frequently. He should avoid concentrated exposure to temperature extremes, humidity, fumes, odors, dusts, gases, poor ventilation and hazards like unprotected heights and dangerous machinery. He can understand complex and/or detailed instructions, but due to deficits in concentration persistence, and pace, he is reasonably limited to performing simple and routine tasks on a sustained basis with only routine breaks. Any work should involve no more than occasional interaction or contact with the general public, and any work should not require more than occasional interaction with coworkers or supervisors. Any work should involve no more than ordinary or routine changes in work setting or duties. Any work should not require an inflexible production rate pace or strict hourly production quotas.

(R. at 19–20.) At step four, the ALJ found that Corey is unable to perform any of his previous work. (R. at 26–27.) Finally, at step five, the ALJ concluded that—given

6

Corey's age, education, work experience, and RFC—he is able to perform jobs that exist in significant numbers in the national economy. (R. at 27.) Examples of these jobs included marker, routing clerk, and cleaner. (R. at 28.) Based on the ALJ's conclusion at step five, he determined that Corey is not disabled. (R. at 28.)

## DISCUSSION

Corey makes one argument: The ALJ committed reversible error in finding unpersuasive the opinion of Corey's therapist. The Commissioner responds that the ALJ found that opinion inconsistent with objective evidence and was therefore entitled to reject it. No doubt, the ALJ's discussion of Fawley's opinion could have been longer, and Corey correctly recognizes that the ALJ did not respond to each of her findings. But a fair reading of his opinion—as a whole—demonstrates why he rejected it. That suffices to permit meaningful appellate review.

## I.    Legal Standards

Start with an ALJ's obligation to discuss medical opinions. ALJs must "evaluate every medical opinion" they receive. 20 C.F.R. § 404.1257(c). Of course, they need not accept those opinions without question. *See id.* § 404.1527(d). But when they reject one, they "must provide enough analysis to allow a reviewing court some idea of why" they did so. *Spicher v. Berryhill*, 898 F.3d 754, 758 (7th Cir. 2018). To shed light on that question, ALJs must assess medical opinions in light of several factors— regardless of whether the opinion is from the claimant's treating physician or someone else. *See* 20 C.F.R. § 404.1520c. Those factors include: (1) supportability, meaning the objective medical evidence and explanations on which the opinion rests; (2) consistency with other evidence; (3) the physician's relationship to the claimant;

7

and (4) the physician's bona fides. *See id.* § 404.1520c(c)(1)–(5). Unsurprisingly, the first two—supportability and consistency—are paramount. *See id.* § 404.1520c(a).

Although "ALJs need not comment on every line of a physician's treatment notes," *Kolar v. Berryhill*, 695 F. App'x 161, 161–62 (7th Cir. 2017), they must "respond to the physician's principal conclusions," *id* at 162. By the same token, ALJs often face conflicting opinions—as the ALJ here was. In that case, the ALJ must "evaluate[] the evidence" and justify why they accord more weight to one opinion over another. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004); *see also Colson v. Colvin*, 120 F. Supp. 3d 778, 793 (N.D. Ill. 2015).

## II.     Kimberly Fawley's Opinion

Corey's sole argument on appeal is that the ALJ's treatment of Kimberly Fawley's opinion warrants reversal. The Court thus discusses that opinion in depth, before turning to the ALJ's analysis and Corey's challenges.

Fawley is a qualified mental health professional who treated Corey twice per month between August 2020 and (at least) April 2, 2024—the date she issued her opinion. (R. at 836, 842.) She began the opinion—a "Mental Impairment Questionnaire"—by listing Corey's diagnoses: generalized anxiety, major depressive disorder (moderate), and attention deficit disorder. (R. at 836.) She discussed the medications Corey has been prescribed; explained that mental-health treatment has improved some of Corey's symptoms but not others; and stated that Corey will "require ongoing mental health services" for the foreseeable future, though his prognosis for improvement is "fair." (R. at 836.)

Fawley then completed a checklist of what she believed to be Corey's symptoms. Included in that list were "decreased energy," "depressed mood," "distractibility," "panic attacks," and "generalized anxiety." (R. at 837–838.) She then completed another checklist, which sought information about Corey's "mental abilities and aptitudes needed to do unskilled work." (R. at 839.) For most of the abilities, Fawley concluded that Corey possessed no limitations. (R. at 839.) For others—including Corey's ability to "maintain attention for two hour segment[s]," "perform at a consistent pace," and "respond appropriately to changes in routine work setting"—Fawley indicated that Corey's abilities were "limited but satisfactory." (R. at 839.) And as far as Corey's ability to "deal with work stress," Fawley concluded that Corey was "unable to meet competitive standards"—the second-highest limitation on the chart. (R. at 839.) She applied that same limitation to Corey's ability to "set realistic goals or make plans independently of others." (R. at 840.) When asked about other symptoms, Fawley incorporated a written assessment she performed in January 2024. (R. at 835, 838.)

As far as Fawley's written explanations, she stated that Corey "struggles to set and follow through with realistic goals" and becomes overwhelmed with "social anxiety." (R. at 840.) She also wrote that Corey is "typically somewhat unkept," has "significant anxiety around travelling," and "avoids leaving town," (R. at 840.) Finally, when asked to describe the clinical findings that "demonstrate the severity" of Corey's "mental impairment and symptoms," Fawley directed the reader to pages nine and ten of her January 2024 assessment. (R. at 836.) Those pages, in turn, detail

9

Corey's general background information, diagnoses, and reports about his symptoms. (*See* R. at 832–33.) Finally, Fawley was asked to estimate how often Corey would be absent from work, and she responded with, "More than 4 days per month." (R. at 842.)

### III. The ALJ's Analysis

The ALJ discussed Fawley's opinion at the end of his RFC analysis. To start, he acknowledged that Fawley was Corey's mental health provider who completed a Mental Impairment Questionnaire in April 2024. (R. at 26.) He then confined his discussion to the two areas in which Fawley found Corey the most limited—namely, her conclusion that Corey "is 'unable to meet competitive standards' in terms of" his ability to "'deal with normal work stress' and 'set realistic goals.'" (R. at 26 (quoting R. at 839.) But the ALJ disagreed with those ratings. In his view, they were "not adequately supported by citation to specific objective evidence." (R. at 26.) True, the ALJ recognized, Fawley had incorporated her previous assessment into her opinion. But he was still not convinced: "Although [Fawley] referenced [Corey's] January 2024 mental health assessment, the objective findings therein are not suggestive of debilitating limitations." (R. at 26.) The ALJ emphasized that although Corey had reported difficulty with "job functioning" and his previous employment, Corey had attributed those difficulties, in part, "to the decisions or behaviors of others." (R. at 26 (citing R. at 827 (discussing, among other things, Corey's frustration at being "thrown under the bus" at work and repeated termination for "the decisions or behaviors of others")).) The "longitudinal treatment notes," the ALJ reasoned, "do not

10

support the ratings" that Fawley assigned. (R. at 26.) All told, the ALJ concluded that Fawley's assessment was "not persuasive." (R. at 26.)

Corey takes issue with numerous aspects of this analysis. First, he contends, the ALJ failed to "mention the numerous symptoms and other supporting explanations" Fawley identified to substantiate her opinion. (Pl. Br. 10.[2]) Corey then lists each "signs and symptoms" box beside which Fawley included a checkmark. But the ALJ's failure to discuss these symptoms was not error. Indeed, an ALJ need only respond to a medical opinion's "principal conclusions." *Kolar*, 695 F. App'x at 162. Nowhere do the regulations require ALJs—in examining medical opinions—to articulate each symptom on which those conclusions are presumably based. *Cf.* 20 C.F.R. § 404.1520c. To the contrary, the regulations expressly cabin the ALJ's duty to discussing an opinion's supportability and consistency. *See id.* § 404.1520c(2) (explaining that the administration "will explain how [it] considered the supportability and consistency factors," but that it is "not required to" explain how it considered other factors). Nor does Fawley's list of symptoms shed light on whether or to what extent those symptoms limit Corey's ability to work. It is therefore unclear what Corey expects the ALJ to have drawn from this list. *See Kolar*, 695 F. App'x at 161–62. (affirming that "ALJs need not comment on every line of a physician's treatment notes").

---

[2] "Pl. Br." refers to Corey's opening brief, filed February 13, 2026. (Doc. 10.)

Even so, the ALJ elsewhere discussed many of the symptoms that appeared on Fawley's list. For example, Fawley indicated that Corey suffers from "generalized, persistent anxiety." (Pl. Br. 10 (citing R. at 837).) But the ALJ agreed with that assessment: he found anxiety to be among Corey's severe impairments. (R. at 18.) And in crafting Corey's RFC, the ALJ focused largely on that disorder and related symptoms. He recounted evidence that supported Corey's claims of debilitating anxiety. (*See, e.g.*, R. at 21 (noting that that Corey previously quit his job "due to anxiety"); R. at 21 (recounting a January 2023 mental status exam at which "[Corey] appeared anxious"); R. at 22 (indicating that, around October 2023, "medications were helpful" but Corey "continued to report problems with anxiety")).) Yet the ALJ also recognized countervailing evidence showing that Corey could work despite his anxiety. (*See, e.g.*, R. at 24 (explaining that "the mental health treatment" Corey received "was routine and conservative," and that the record was devoid of evidence showing "emergency treatment or hospitalization for mental health purposes"); R. at 24 (explaining that although Corey's medications "do not fully resolve his symptoms," Corey "has acknowledged that they help"); R. at 24 ("[Corey] has presented with abnormal symptoms at times, but most of the objective findings throughout [Corey's] treatment records were not suggestive of disabling impairment.").) Likewise, Fawley suggested that Corey has difficulty sustaining attention and that he displays "distrust and suspiciousness of others." (Pl. Br. 10.) Yet the ALJ squarely addressed these symptoms when he found Corey to have "moderate limitations" in his ability to "concentrate, persist, and maintain pace" and his ability to "interact[] with others."

(R. at 24–25.) Accordingly, the ALJ addressed many of the same symptoms and limitations that Fawley included in her opinion. And an ALJ's decision must be "read as a whole." *Shirley W. v. Comm'r of Soc. Sec.*, No. 1:23-cv-01181, 2024 WL 2337666, at *3 (C.D. Ill. Apr. 25, 2024). It follows that the ALJ cannot be faulted for discussing these symptoms elsewhere in his decision.

Second, Corey challenges the ALJ's rejection of Fawley's two most severe ratings—namely, her conclusion that Corey could not "meet competitive standards" when it comes to his ability to "deal with work stress" and "set realistic goals." (R. at 26.) Again, the ALJ disagreed with those conclusions because they lacked supportability—that is, they were not "adequately supported" or explained by the January 2024 mental health assessment on which they purported to rest. *See Pufahl v. Bisignano*, 12 F.4th 446, 456 (7th Cir. 2025) (affirming ALJ's decision to discredit a medical opinion that suffered from a "lack of explanation"). The ALJ further explained that the January 2024 assessment did not suggest that Corey suffers from the "debilitating" limitations that Fawley ascribed to him. (R. at 26.)

The ALJ's conclusion on this score was reasonable. Indeed, Fawley directed the reader of her opinion to "see [pages] 9–10 of attached assessment." (R. at 836.) But that assessment merely describes Corey's social anxiety, depression, ADHD, and past instances with coworkers; it does not explain how or whether those observations and reports support a finding that Corey suffers from debilitating limitations. And the ALJ in fact found to the contrary, at least in part. He noted how, earlier in that same assessment, Corey attributed some of his difficulties in the workplace to "to the

decisions or behaviors of others." (R. at 26.) In the ALJ's view, that undermined the conclusion that Corey's previous difficulty keeping a job is attributable to *his* mental impairments. Likewise, the ALJ noted the absence of "specific *objective* evidence" contained in the January 2024 assessment, (R. at 26 (emphasis added)); in other words, Fawley's assessment was largely a recitation of Corey's reports of his own symptoms. *See Pufahl*, 12 F.4th 446, 456 (7th Cir. 2025) (explaining that ALJ was entitled to reject an opinion that was "based primarily on subjective reports"). The ALJ thus discharged his obligation to provide the Court "some idea of why" he was not persuaded by Fawley's opinion: her explanations were devoid of objective evidence and, in some instances, contradicted her findings. *Spicher*, 898 F.3d at 758.

Next, citing a Fourth Circuit case, Corey asserts that mental impairments are by definition subjective. So, Corey says, a claimant's subjective statements about their symptoms should be "treated as evidence *substantiating* the claimant's impairment." (Pl. Br. 13 (quoting *Shelley C. v. Comm'r of Soc. Sec.*, 61 F.4th 341, 361 (4th Cir. 2023)).) For Corey's part, the Seventh Circuit has held that an ALJ errs by over-relying on objective evidence to rule out limitations caused by illnesses that are psychological in nature. *See, e.g.*, *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). By the same token, however, the regulations expressly *require* ALJs to consider objective evidence in evaluating a claimant's impairments. *See Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009). Thus, an ALJ cannot deny benefits "*solely* because the available objective evidence does not substantiate" the claimant's statements. *Id.* (quoting 20 C.F.R. § 404.1529(c)(2). But ALJs may *consider* the lack

14

of objective evidence, "along with a host of other factors," in determining the severity of the claimant's mental impairments. *Id.* That is what the ALJ here did. True, the ALJ noted the lack of objective evidence supporting Fawley's conclusion that Corey could not meet competitive standards in tolerating workplace stress. But the ALJ also relied on other criteria in denying Corey's claim—for instance, his daily activities and history of relatively conservative treatment. (*See, e.g.,* R. at 23 (discussing Corey's "physical activity such as yardwork"); R. at 24 ("[T]he mental health treatment that was provided to the claimant was routine and conservative.").) Accordingly, the ALJ did not "improperly increase[]" Corey's "burden of proof" by "requiring that [his] subjective statements be validated by objective medical support." *Shelley*, 61 F.4th at 362. Instead, the ALJ relied on a lack of objective evidence as one ground for finding that Corey was not disabled.

Corey also points to *Annette C. v O'Malley*. No. 4:23-CV-00094, 2024 WL 4234050 (S.D. Ind. Sep. 19, 2024), but this case is different. Indeed, the ALJ there "summarized" the medical opinion in question "but failed to provide any analysis on how" the doctor supported his findings. *Id.* at *4. That blatant omission—which the Commissioner did not even try to defend—"prevented the court from being able to conduct meaningful review." *Id.* (quoting . *Michelle E. v. Kijakazi*, No. 2:21-cv-0227, 2022 WL 4480377, at *5 (S.D. Ind. Sep. 27, 2022)). The ALJ here, by contrast, *did* discuss supportability—Fawley's ratings were "not adequately supported by citation to specific objective evidence." (R. at 26.) But the ALJ did not stop with that rather boilerplate statement. Instead, he went on to discuss the assessment that Fawley had

15

incorporated into her opinion by reference. In doing so, he found the findings contained in that assessment were "not suggestive of debilitating limitations" and, at times, suggested the opposite. (R. at 26.)[3]

Corey correctly emphasizes that an ALJ must consider "all relevant evidence." (Pl. Br. 11 (quoting *Clifford*, 227 F.3d at 874); *see also* Pl. Br. 14 ("[T]he ALJ's citations . . . omitted highly relevant information that does in fact support [Fawley's] opined mental limitations.").) That is true as far as it goes. But that is not the same thing as saying that an ALJ must include all of the evidence in his *written decision*. To the contrary, courts have emphasized that an ALJ "need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning." *Warnell*, 97 F.4th at 1053. Corey's observation that the ALJ did not discuss all relevant evidence thus does not warrant remand. True, the ALJ did not cite, for example, certain notes that shed light Corey's suicidal ideation, "poor frustration tolerance," difficulty "maintain[ing] boundaries in the workplace," refusal to drive, and "ongoing issues with anxiety." (Pl. Br. 14 (citing R. at 827, 830–32).) Yet the ALJ discussed *other* evidence that pertained to precisely those symptoms. (*See, e.g.*, R. at 22 ("[Corey] reported that the medications help with suicidal thoughts but he continues to experience anxiety"); R. at 20 (noting that "Corey "started to drive with a permit but found it overwhelming");

---

[3] Fawley also checked a box on the final page of her questionnaire indicating that Corey's impairments would cause him to miss "more than 4 days per month." (R. at 842.) Although the ALJ did not expressly mention this finding, his supportability analysis would seem to apply to her opinion as a whole. For the reasons discussed in this order, the ALJ was entitled to reject the four-day limitation on the same grounds as he rejected the other limitations.

R. at 21 ("[Corey] has described significant anxiety in past restaurant work related to working with others, and he reported that he had left several jobs due to anxiety.").) Accordingly, the ALJ included in his written decision much—though not all—of the evidence that was favorable to Corey. He therefore did not "ignore an entire line of evidence contrary to" his ruling. *Benito M. v. Kijakazi*, No. 20-cv-5976, 2022 WL 2828741, at *8 (N.D. Ill. July 20, 2022). His failure to discuss *all* relevant evidence does not warrant reversal.

To Corey's credit, the ALJ's conclusion that the "longitudinal treatment notes do not support" Fawley's restrictions is perfunctory; it sheds little insight into what aspects of those records actually undermined Fawley's restrictions. (Pl. Br. 15.) And if that was the only ground the ALJ provided to discredit Fawley's opinion, this Court would be compelled to reverse. But it was not. Indeed, that was merely one of two rationales the ALJ provided in discussing the supportability of Fawley's opinion—the other being, as discussed, the ALJ's conclusion that the opinion was not supported by her January 2024 assessment. And again, courts must read an ALJ's opinion "as a whole," *Shirley*, 2024 WL 2337666, at *3, rather than "nitpick" it, *Poole v. Kijakazi*, 28 F.4th 792, 797 (7th Cir. 2022); *see also Brandi B. v. Kijakazi*, No. 21-cv-4383, 2022 WL 2463558, at *6 (N.D. Ill. July 6, 2022) ("A reviewing court is charged with reading an ALJ's opinion as a whole and taking a common-sense approach to its review.").

Critically, the ALJ's analysis of Fawley's opinion appeared immediately after his discussion of the state-agency opinions, which concluded that Corey could perform a limited range of light work notwithstanding his mental impairments. (R. at 26.)

The ALJ found those opinions persuasive, in part because they were "well supported by the medical record." (R. at 26.) And the ALJ's discussion of those opinions, in turn, immediately preceded his discussion of the medical record. Among other things, the ALJ emphasized that Corey's mental-health treatment was conservative, (R. at 24), that Corey's daily activities undermine the conclusion that he is disabled, (R. at 24), and that Corey "has never been fired from a job because of problems getting along with others," (R. at 24.) Reading the opinion as a whole, it becomes clear that although the ALJ found Corey's anxiety limited his ability to work, there was ample evidence to conclude that he could perform light work with additional restrictions. This conclusion—and the evidence upon which the ALJ based it—was inconsistent with Fawley's opinion. Reading the ALJ's opinion this way provides insight into his statement that the "longitudinal treatment notes do not support" Fawley's opinion. (R. at 26.) All told, ALJ said enough to provide the Court "some idea" why he rejected Fawley's opinion. *Spicher*, 898 F.3d at 758.

## CONCLUSION

IT IS THEREFORE ORDERED that the Commissioner's decision be affirmed. The Clerk is DIRECTED to enter judgment and close this case.

*So ordered.*

Entered this 16th day of June 2026.

s/ Ronald L. Hanna

Ronald L. Hanna
United States Magistrate Judge

18